# 18-2990(L)

**14-18-3710(CON),18-3712(CON),**
**18-3715(CON),18-3850(CON),19-1272(CON)**

*To Be Argued By*:
MATTHEW D. PODOLSKY

## United States Court of Appeals
### FOR THE SECOND CIRCUIT
**Docket Nos. 18-2990(L), 18-3710(CON), 18-3712(CON),**
**18-3715(CON), 18-3850(CON), 19-1272(CON)**

———◆◆◆———

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI,
LOUIS CIMINELLI, ALAIN KALOYEROS, also known as Dr. K,

*Defendants-Appellants.*

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE,
KEVIN SCHULER,

*Defendants.*

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF ON REMAND FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

MATTHEW D. PODOLSKY,
DEREK WIKSTROM,
WON S. SHIN,
*Assistant United States Attorneys,*
*Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  2

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT:

POINT I—The Court Should Vacate the Wire Fraud
Counts and Remand for Retrial Without
Evaluating the Sufficiency of the Evidence
Under New Law. . . . . . . . . . . . . . . . . . . . . . . . .  6

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  7

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        1.  Retrial Is Not Barred When a
Conviction Is Vacated Based on an
Intervening Decision Narrowing the
Statute of Conviction . . . . . . . . . . . . . . .  9

        2.  The Defendants' Categorical Arguments
Against a Retrial Are Unpersuasive . 17

POINT II—The Evidence Is Sufficient to Establish
Wire Fraud After *Ciminelli* . . . . . . . . . . . . . . .  20

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  20

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  21

        1.  The Evidence Is Sufficient to Establish
Traditional Property Fraud. . . . . . . . .  22

           a.  The Defendants Schemed to Obtain
Money or Property . . . . . . . . . . .  23

ii

PAGE

      b.   The Defendants Intended to Defraud by Intending to Induce Reliance on False Representations about the RFP Process . . . . . . . . .  25

   2.  Traditional Money-Or-Property Fraud Does Not Require Proof of Intent to "Rip Off" . . . . . . . . . . . . . . .  30

   3.  The Evidence Is Sufficient to Support a Finding of Intent to Cause Pecuniary Harm . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

POINT III—Gerardi's False Statements Conviction Should Be Affirmed . . . . . . . . . . . . . . . . . . . . . . .  41

 A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  41

 B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  42

 C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  44

   1.  The Invalidation of the Right-to-Control Theory Does Not Bear on the Materiality of Gerardi's False Statements . . . . . . .  44

   2.  Gerardi Is Not Entitled to a New Trial on "Prejudicial Spillover" Grounds . . .  48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

iii

## TABLE OF AUTHORITIES

*Cases*:

*Aiello v. United States,*
 143 S. Ct. 2491 (2023) . . . . . . . . . . . . . . . . . . . . . . 6

*Ball v. United States,*
 163 U.S. 662 (1896) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Brogan v. United States,*
 522 U.S. 398 (1998) . . . . . . . . . . . . . . . . . . . . . 43, 45

*Burks v. United States,*
 437 U.S. 1 (1978) . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*Carpenter v. United States,*
 484 U.S. 19 (1987) . . . . . . . . . . . .  23, 24, 25, 27, 31

*Chiarella v. United States,*
 445 U.S. 222 (1980) . . . . . . . . . . . . . . . . . . . . . . . 26

*Ciminelli v. United States,*
 598 U.S. 306 (2023) . . . . . . . . . . . . . . . . . . . *passim*

*Cleveland v. United States,*
 531 U.S. 12 (2000) . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Durland v. United States,*
 161 U.S. 306 (1896) . . . . . . . . . . . . . . . . . . . . . . . 29

*Justices of Boston Mun. Ct. v. Lydon,*
 466 U.S. 294 (1984) . . . . . . . . . . . . . . . . . . . . . . 8, 12

*Kaloyeros v. United States,*
 143 S. Ct. 2490 (2023) . . . . . . . . . . . . . . . . . . . . . . 6

iv

PAGE

*Kelly v. United States,*
    140 S. Ct. 1565 (2020) . . . . . . . . . . . . . . . . . . . 23, 24

*Lockhart v. Nelson,*
    488 U.S. 33 (1988) . . . . . . . . . . . . 7, 12, 13, 14, 17

*Loughrin v. United States,*
    573 U.S. 351 (2014) . . . . . . . . . . . . . . . . . . . . . . . 27

*McNally v. United States,*
    483 U.S. 350 (1987) . . . . . . . . . . . . . . . . . . . . . . . 23

*Neder v. United States,*
    527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . 26, 31

*Pasquantino v. United States,*
    544 U.S. 349 (2005) . . . . . . . . . . . . . . . . 23, 24, 25

*Price v. Georgia,*
    398 U.S. 323 (1970) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Richardson v. United States,*
    468 U.S. 317 (1984) . . . . . . . . . . . . . . . . . . . . . 8, 12

*Shaw v. United States,*
    580 U.S. 63 (2016) . . . . . . . . . . . . . . . . . 27, 31, 32

*Skilling v. United States,*
    561 U.S. 358 (2010) . . . . . . . . . . . . . . . . 10, 23, 25

*United States v. Adekanbi,*
    675 F.3d 178 (2d Cir. 2012) . . . . . . . . . . . . . 43, 47

*United States v. Adler,*
    380 F.2d 917 (2d Cir. 1967) . . . . . . . . . . . . . . . . 46

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 42

v

PAGE

*United States v. Bonds*,
784 F.3d 582 (9th Cir. 2015) . . . . . . . . . . . . . . . . 46

*United States v. Brettschneider*,
832 F. App'x 14 (2d Cir. 2020) . . . . . . . . . . . . . . 43

*United States v. Bruno*,
661 F.3d 733 (2d Cir. 2011) . . . . . . . . . . . . . *passim*

*United States v. Caltabiano*,
871 F.3d 210 (2d Cir. 2017) . . . . . . . . . . . . . . . . 21

*United States v. Capers*,
20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . . . . 42

*United States v. Clarke*,
979 F.3d 82 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 44

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013) . . . . . . . . . . . . . . . . 47

*United States v. Ellyson*,
326 F.3d 522 (4th Cir. 2003) . . . . . . . . . . . . . 15, 16

*United States v. Finazzo*,
850 F.3d 94 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 35

*United States v. Ford*,
703 F.3d 708 (4th Cir. 2013) . . . . . . . . . . . . . 15, 16

*United States v. Frampton*,
382 F.3d 213 (2d Cir. 2004) . . . . . . . . . . . . . . . . 19

*United States v. Gonzales*,
841 F.3d 339 (5th Cir. 2016) . . . . . . . . . . . . . . . . 19

*United States v. Greenberg*,
835 F.3d 295 (2d Cir. 2016) . . . . . . . . . . . . . 21, 40

vi

PAGE

*United States v. Guadagna*,
   183 F.3d 122 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 30

*United States v. Harmon*,
   632 F.2d 812 (9th Cir. 1980) . . . . . . . . . . . . . . . 14

*United States v. Harrington*,
   997 F.3d 812 (8th Cir. 2021) . . . . . . . . . 15, 16, 17

*United States v. Houston*,
   792 F.3d 663 (6th Cir. 2015) . . . . . . . . . 15, 16, 17

*United States v. Jabar*,
   19 F.4th 66 (2d Cir. 2021) . . . . . 21, 36, 43, 45, 47

*United States v. Johnson*,
   945 F.3d 606 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 36

*United States v. Kim*,
   65 F.3d 123 (9th Cir. 1995) . . . . . . . . . . . . . . 15, 16

*United States v. Labat*,
   905 F.2d 18 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . 20

*United States v. Leahy*,
   464 F.3d 773 (7th Cir. 2006) . . . . . . . . . . . . . . . . 29

*United States v. Males*,
   459 F.3d 154 (2d Cir. 2007) . . . . . . . . . . . . . . 30, 32

*United States v. Mercedes*,
   401 F. App'x 619 (2d Cir. 2010) . . . . . . . . . . 43, 47

*United States v. Miller*,
   954 F.3d 551 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 15

*United States v. Muratov*,
   849 F. App'x 301 (2d Cir. 2021) . . . . . . . . . . . . . 30

vii

PAGE

*United States v. Percoco,*
    13 F.4th 158 (2d Cir. 2021) . . . . . . . . . . . . *passim*

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1974) . . . . . . . . . . . . *passim*

*United States v. Reynoso,*
    38 F.4th 1083 (D.C. Cir. 2022) . . . . . . . . . . . 15, 16

*United States v. Robison,*
    505 F.3d 1208 (11th Cir. 2007) . . . . . . . . . . 15, 16

*United States v. Rossomando,*
    144 F.3d 197 (2d Cir. 1998) . . . . . . . . . . . . . . . 32

*United States v. Rowe,*
    56 F.2d 747 (2d Cir. 1932) . . . . . . . . . . . . . . 27, 32

*United States v. Sampson,*
    371 U.S. 75 (1962) . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Schwartz,*
    924 F.2d 410 (2d Cir. 1991) . . . . . . . . . . . . *passim*

*United States v. Sepulveda,*
    420 F. Supp. 3d 153 (S.D.N.Y. 2019) . . . . . . . . . 15

*United States v. Serrano,*
    856 F.3d 210 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 7

*United States v. Shanks,*
    608 F.2d 73 (2d Cir. 1979) . . . . . . . . . . . . . . . . . 46

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . 5

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987) . . . . . . . . 30, 32, 33, 34

viii

PAGE

*United States v. Wacker,*
    72 F.3d 1453 (10th Cir. 1995) . . . . . . . . . . . . 15, 16

*United States v. Weaver,*
    698 F. App'x 629 (2d Cir. 2017) . . . . . . . . . . . . . . 44

*United States v. Weaver,*
    860 F.3d 90 (2d Cir. 2017) . . . . . . . . . . . 21, 34, 40

*United States v. Weems,*
    49 F.3d 528 (9th Cir. 1995) . . . . . . . . . . . . . . . . 15

*Ventura de Paulino v. N.Y. City Dep't of Educ.,*
    959 F.3d 519 (2d Cir. 2020) . . . . . . . . . . . . . . . . 47

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

2 C.G. Addison, *Wrongs and Their Remedies:*
    *A Treatise on the Law of Torts*
    (4th English ed. 1876). . . . . . . . . . . . . . . . . . . 26, 28

1 Melville M. Bigelow, *A Treatise on the Law of*
    *Fraud on Its Civil Side* (1888) . . . . . . . . . . . . . . . 28

*Black's Law Dictionary* (4th ed. 1951) . . . . . . . . 23, 24

3 Dan B. Dobbs et al., *The Law of Torts*
    (2d ed. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

W. Page Keeton et al., *Prosser and Keeton on the*
    *Law of Torts* (5th ed. 1984) . . . . . . . . . . . . . . . . . 28

ix

PAGE

3 Wayne R. LaFave, *Substantive Criminal Law*
(3d ed. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Restatement (Second) of Torts (1977). . . . . . . . . . . 26

Henry T. Terry, *Intent to Defraud*,
25 Yale L.J. 87 (1915). . . . . . . . . . . . . . . . . . . . . 28

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 18-2990(L), 18-3710(CON), 18-3712(CON), 18-3715(CON), 18-3850(CON), 19-1272(CON)

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, ALAIN KALOYEROS, also known as Dr. K,

*Defendants-Appellants,*

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE, KEVIN SCHULER,

*Defendants.*

———————

## BRIEF ON REMAND
## FOR THE UNITED STATES OF AMERICA

———————

2

**Preliminary Statement**[1]

The defendants in this case conspired to and did engage in a scheme to obtain more than $850 million through material misrepresentations and false or fraudulent pretenses. A jury convicted them of wire fraud and wire fraud conspiracy for doing so. The District Court concluded that there was sufficient evidence supporting those convictions, as did this Court. The Supreme Court reversed the judgment of this Court, concluding that the right-to-control theory of wire and mail fraud—which had been the settled law of this Circuit for decades—is not a valid basis for criminal liability. The defendants now seek to elude retrial. The defendants are indeed entitled to have a jury determine whether the Government can meet its burden of proof under the statute as interpreted by the Supreme Court, but they are not entitled to prevent a correctly instructed jury from rendering a just verdict. This Court should affirm Joseph Gerardi's conviction

_____

[1] This brief addresses the convictions that resulted from the trial on Counts One, Two, Four, and Sixteen of the Indictment (the "Fraud Trial"). Alain Kaloyeros, Steven Aiello, Joseph Gerardi, and Louis Ciminelli were convicted on Count One (conspiracy to commit wire fraud); Kaloyeros, Aiello, and Gerardi were convicted on Count Two (wire fraud as to Syracuse projects); Kaloyeros and Ciminelli were convicted on Count Four (wire fraud as to Buffalo projects); and Gerardi was convicted on Count Sixteen (false statements).

for making false statements, vacate the wire fraud convictions, and remand for retrial.

## Background

"This is a case about lying and cheating to get huge state construction contracts worth hundreds of millions of dollars, all paid for by the taxpayers of New York." (A. 1012 (Fraud Tr. 37) (Government's opening statement)).[2] As the evidence at trial demonstrated, Alain Kaloyeros, Steven Aiello, Joseph Gerardi, and Louis Ciminelli conspired to and did commit fraud to secure New York State-funded construction projects, worth hundreds of millions of dollars, for COR Development (Aiello and Gerardi's company) and for LPCiminelli (Ciminelli's company). They did so by falsely representing to Fort Schuyler Management Corporation that COR Development and LPCiminelli had been awarded these projects based on fair and competitive request-for-proposal processes. In fact, these conspirators used Kaloyeros's position of

───────────

[2]   "A." refers to the appendix filed with the defendants' initial briefs on appeal; "Fraud Tr." refers to the trial transcript of the Fraud Trial; "Gov't Br." refers to the Government's initial brief; "SA" refers to the supplemental appendix filed with the Government's initial brief; and "Remand Br." refers to the defendants' joint brief on remand. Unless otherwise noted, quotations omit internal quotation marks, citations, alterations, and footnotes. Unless otherwise defined, capitalized terms have the meanings assigned in the Government's initial brief.

4

authority and control at Fort Schuyler and SUNY Poly to rig the process so that COR Development and LPCiminelli would be chosen without fair or true competition. Through fraud and deceit, these defendants obtained nearly $1 billion of New York State's money, which had been granted to Fort Schuyler. *See United States v. Percoco*, 13 F.4th 158, 164-68 (2d Cir. 2021); *see also* Gov't Br. 26-53.

Consistent with the law of this Circuit at the time, the Government argued to the jury, in substance, that the defendants sought to obtain that property by depriving Fort Schuyler of its right to control its assets —that is, the Government argued that the defendants' fraud was "designed to deprive Fort Schuyler of potentially valuable economic information" by making "misrepresentation[s] . . . about something that the victim, that a victim would consider valuable when deciding how to spend its money." (A. 1471 (Fraud Tr. 2513)). And the District Court instructed the jury, among other things, that, under the wire fraud statute, "[p]roperty includes intangible interests such as the right to control the use of one's assets," and "[t]he victim's right to control the use of its assets is injured when it is deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets." (A. 1554 (Fraud Tr. 2884)). This Court later observed that "this charge closely tracked the language set forth in our prior opinions" and, based on the law as it was at the time, found no error in the jury instructions. *Percoco*, 13 F.4th at 175-76.

At the conclusion of trial, the jury returned a verdict of guilty on all counts. *Id.* at 169. On appeal, in

5

addition to addressing arguments regarding the jury
instructions, this Court considered the defendants'
claims that the evidence was insufficient to support
the jury's verdict. *See id.* at 167-74. In rejecting those
challenges, this Court concluded, among other things,
that "[t]he trial evidence demonstrated that the de-
fendants, by secretly tailoring the Buffalo and Syra-
cuse RFPs, took steps to reduce the possibility that
companies other than their own would be seen as com-
petitive, or even qualified at all, for the bids at issue."
*Id.* at 170-71. This Court also observed that "the record
does not support the clean division between the award
of preferred developer status and the subsequent
awards of particular development contracts that de-
fendants describe," and rejected the defendants' claim
that the scheme constituted "a mere 'fraudulent in-
ducement[ ] to gain access to' the development con-
tracts," *id.* at 171 (quoting *United States v. Schwartz*,
924 F.2d 410, 421 (2d Cir. 1991)), concluding instead
that the defendants' misrepresentations went to "an
essential element of the bargain," *id.* (quoting *United
States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)).

The Supreme Court subsequently granted Ci-
minelli's petition for a writ of certiorari, which pre-
sented the question of "[w]hether the Second Circuit's
'right to control' theory of fraud—which treats the dep-
rivation of complete and accurate information bearing
on a person's economic decision as a species of property
fraud—states a valid basis for liability under the fed-
eral wire fraud statute, 18 U.S.C. § 1343." The Su-
preme Court ultimately held that "'potentially valua-
ble economic information' 'necessary to make discre-
tionary economic decisions' is not a traditional

6

property interest," and therefore "the right-to-control theory is not a valid basis for liability under § 1343," reversed the judgment of this Court, and remanded the case for further proceedings. *Ciminelli v. United States*, 598 U.S. 306, 309, 317 (2023).[3] The only Justice to address the practical implications for this case— Justice Alito—noted his understanding that the Supreme Court's opinion did not "address fact-specific issues on remedy outside the question presented," including "the Government's ability to retry [Ciminelli] on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts." *Id.* at 317-18 (Alito, *J.*, concurring).

## ARGUMENT

### POINT I

### The Court Should Vacate the Wire Fraud Counts and Remand for Retrial Without Evaluating the Sufficiency of the Evidence Under New Law

The defendants contend that this Court should direct judgments of acquittal. The defendants claim that the Government's reliance at trial on the right-to-

---

[3]   The Supreme Court subsequently granted the certiorari petitions filed by Aiello, Gerardi, and Kaloyeros, vacated this Court's judgment, and remanded for further consideration in light of *Ciminelli*. *Aiello v. United States*, 143 S. Ct. 2491 (2023); *Kaloyeros v. United States*, 143 S. Ct. 2490 (2023).

control theory, which was valid at the time under prevailing Second Circuit law but was subsequently invalidated, entitles them to acquittal without further inquiry. That argument is foreclosed by this Court's precedent. While the defendants' convictions on Counts One, Two, and Four should be vacated in light of *Ciminelli*, this Court should remand for retrial on those counts—and it need not assess the sufficiency of the evidence under *Ciminelli* before doing so.

## A. Applicable Law

The Double Jeopardy Clause provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. It has long been settled that the Double Jeopardy Clause does not prohibit the Government from retrying a defendant whose conviction has been reversed on appeal because of an error in the trial proceedings. *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988); *Burks v. United States*, 437 U.S. 1, 14-15 (1978); *Ball v. United States*, 163 U.S. 662, 672 (1896). The Supreme Court has identified an exception to that rule: in *Burks*, the Court held that the Double Jeopardy Clause bars retrial "when a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict." *Nelson*, 488 U.S. at 39 (citing *Burks*, 437 U.S. at 18); *accord United States v. Serrano*, 856 F.3d 210, 214 (2d Cir. 2017) ("When a trial has ended in a conviction, the double jeopardy guarantee imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside . . .

unless the conviction has been reversed because of insufficiency of the evidence.").

The different treatment of reversal for insufficient evidence and reversal for trial error reflects the principle that "the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." *Richardson v. United States*, 468 U.S. 317, 325 (1984). "[A]n appellate court's finding of insufficient evidence to convict on appeal from a judgment of conviction is for double jeopardy purposes, the equivalent of an acquittal." *Id.* It thus "terminate[s] the initial jeopardy," and the Double Jeopardy Clause prohibits a successive prosecution. *Justices of Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 308 (1984). By contrast, when a defendant's conviction has been set aside based on ordinary trial error, he remains in "continuing jeopardy" because the proceedings "have not run their full course." *Price v. Georgia*, 398 U.S. 323, 326 (1970). In those circumstances, a fundamental prerequisite for application of the Double Jeopardy Clause is not satisfied, and the Clause does not bar retrial. *Id.*; *see also Lydon*, 466 U.S. at 308 ("The Double Jeopardy Clause is not an absolute bar to successive trials. The general rule is that the Clause does not bar reprosecution of a defendant whose conviction is overturned on appeal.").

9

## B. Discussion

### 1. Retrial Is Not Barred When a Conviction Is Vacated Based on an Intervening Decision Narrowing the Statute of Conviction

The Government concedes that the defendants' convictions on the wire fraud counts must be vacated because they were "based solely on the right-to-control theory," *Ciminelli*, 598 U.S. at 316, a theory that this Court endorsed for decades before the Supreme Court invalidated it. In particular, the jury instructions, while consistent with well-established Second Circuit precedent, was erroneous in light of the subsequent decision in *Ciminelli* insofar as they allowed jurors to convict on the right-to-control theory rather than a traditional understanding of money or property. The Government agrees that the instructional error was not harmless in the unique circumstances of this case.

The defendants argue that they may not be retried because the Government proceeded on the now-invalid right-to-control theory rather than a traditional property fraud theory. (Remand Br. 9-17). But this Court has permitted retrial when "a conviction has been reversed due to a subsequent change in the law" regarding the scope of the statute of conviction. *United States v. Bruno*, 661 F.3d 733, 741 (2d Cir. 2011). Under the principles established in *Bruno*, retrial in this case on the wire fraud counts is permitted.

In *Bruno*, a state official was charged with and convicted at trial of honest services mail fraud based on his "failure to disclose conflicts of interest." 661 F.3d at 735. While Bruno's appeal was pending, the

10

Supreme Court decided *Skilling v. United States*, 561 U.S. 358 (2010), which narrowed the scope of the honest services statute by holding that it "criminalizes only fraudulent schemes effectuated through bribes or kickbacks and does not criminalize mere failures to disclose conflicts of interest." *Bruno*, 661 F.3d at 736. After concluding that there was instructional error at Bruno's trial in light of *Skilling* and that the Government was free to seek a superseding indictment to conform the charges to the new honest services fraud standard, *id.* at 739-40, this Court addressed whether retrial was permitted. Bruno argued that "the case against him—from its inception up to his conviction—was built around a theory of honest services fraud invalidated by *Skilling*," and that he accordingly was "entitled to a judgment of acquittal if there is insufficient evidence in the record of the first trial to support a conviction under a bribery or kickback theory of honest services fraud subsequently required by *Skilling*, even though the theory was not asserted in the Indictment or charged to the jury." *Id.* at 742. Relying on out-of-Circuit authority, the government urged the Court to remand for a new trial without conducting a sufficiency inquiry because "it would be unfair to conduct one against a standard that did not exist at the time of the trial." *Id.*

This Court "recognize[d] that in some cases there may be sound reasons for refusing to consider the sufficiency of the evidence where there has been a subsequent change in the law." *Id.* at 743. Indeed, several Courts of Appeals have "reasoned that barring retrial because the government failed to proffer sufficient proof to satisfy a standard that did not exist at the

11

time of conviction would be unfair to the government," while remanding for retrial "would allow the government the opportunity to muster evidence sufficient to satisfy the new standard." *Id.* (citing cases from the Fourth, Ninth, Tenth, and Eleventh Circuits). But in Bruno's case, the government "conceded that it would present no new evidence if Bruno were retried and that it presented at trial all its evidence regarding quid pro quo required by *Skilling*." *Id.* In those circumstances, the Court found it appropriate to assess the sufficiency of the evidence under the new *Skilling* standard, ultimately concluding that the evidence was sufficient and remanding for a new trial. *Id.* at 743-45. The Court left "for another day" the question whether there are "other cases" where it would be appropriate to remand for a new trial without conducting a sufficiency inquiry under the intervening change in the law. *Id.* at 743.

Here, unlike in *Bruno*, the Government does not concede that it would present no new evidence relevant to a traditional property theory under *Ciminelli*, *i.e.*, evidence supporting a property theory other than the right-to-control theory. For example, the Government may well offer at a retrial additional evidence regarding competitors that could have submitted proposals to Fort Schuyler absent the defendants' bid-rigging, including the quality and prices of services that those competitors would have offered, as well as fact and/or expert testimony regarding harm to the victim caused by the defendants' fraud. Thus, this Court is faced with the question it reserved in *Bruno*: whether it may remand for a new trial without first conducting a sufficiency inquiry under the new law governing the scope of the statute of conviction.

12

As this Court previously recognized, there are indeed "sound reasons" to remand for retrial without considering the sufficiency of the evidence under changed law. Such a rule is consistent with Supreme Court precedent. In *Richardson*, for example, the Supreme Court held that "[r]egardless of the sufficiency of the evidence at [his] first trial," a defendant had "no valid double jeopardy claim" when the trial court had declared a mistrial following a hung jury, because such a ruling "is not an event that terminates the original jeopardy." 468 U.S. at 326. Similarly, in *Lydon*, the Supreme Court rejected the claim of a defendant who was convicted at a bench trial, invoked a state procedure allowing for a de novo jury trial, and then argued that the jury trial was barred because the evidence at the bench trial had been insufficient. 466 U.S. at 307. The Supreme Court reasoned that the defendant had "fail[ed] to identify any stage of the state proceedings that can be held to have terminated jeopardy," emphasizing the difference between a mere "claim of evidentiary failure" and an actual "legal judgment to that effect." *Id.* at 309. The defendants in this case are similarly situated to the defendants in *Richardson* and *Lydon*; no stage of the prior proceedings held the evidence of their first trial insufficient.

The Supreme Court's decision in *Lockhart v. Nelson* is particularly instructive. There, the Supreme Court held that the Double Jeopardy Clause did not forbid retrial of a defendant under a habitual offender statute where his sentence had been set aside because he had received a pardon for one of the convictions supporting his recidivist enhancement. *Nelson*, 488 U.S. at 34-37. The Supreme Court concluded that when a

13

conviction is reversed because the trial court has erroneously admitted certain evidence, a new trial is permissible even if the rest of the evidence alone would have been insufficient to sustain the conviction. *Id.* at 40-42. The Supreme Court reasoned that the "basis for the *Burks* exception to the general rule" allowing retrial after reversal of a conviction "is that a reversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence." *Id.* at 41. "A trial court in passing on such a motion considers all of the evidence it has admitted, and to make the analogy complete it must be this same quantum of evidence which is considered by the reviewing court." *Id.* at 41-42.

The Supreme Court further reasoned that permitting retrial in such a situation "is not the sort of governmental oppression at which the Double Jeopardy Clause is aimed; rather, it serves the interest of the defendant by affording him an opportunity to 'obtain a fair readjudication of his guilt free from error.'" *Id.* at 42 (quoting *Burks*, 437 U.S. at 15). It also serves "the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." *Id.* at 38. As the Supreme Court observed, if the district court had made the correct evidentiary ruling at trial, the prosecutor would have had an opportunity to offer additional available evidence. *Id.* at 42. Thus, allowing retrial

14

"merely recreates the situation" that would have existed if the trial court had ruled correctly. *Id.*

The same analysis applies to the situation where, as in this case, a defendant's conviction is reversed because of an intervening change in law. An accurate analogy to the trial court's ruling on a motion for a judgment of acquittal requires the appellate court to assess the sufficiency of the evidence under the legal framework applied by the trial court, not the legal standard that came into effect only after the trial concluded. And allowing the Government to retry the defendant under the correct legal standard "is not the sort of governmental oppression at which the Double Jeopardy Clause is aimed." *Nelson*, 488 U.S. at 42. Because the Government structured its case at trial in reliance on prevailing Circuit law, and therefore had no incentive to present evidence that would satisfy the newly announced legal standard, the evidence actually introduced by the Government did "not necessarily reflect all other available evidence." *United States v. Harmon*, 632 F.2d 812, 814 (9th Cir. 1980) (per curiam).

If retrial were barred whenever a change in law retroactively rendered the evidence insufficient, the Government would be at risk in relying on prevailing law and on the trial court's rulings and would be forced to proffer evidence in support of multiple legal standards to guard against the risk of a change in prevailing circuit law. But evidence related to alternate theories of prosecution could well be disallowed as irrelevant or unnecessarily duplicative. Prosecutorial resources would be wasted, the trial would be prolonged

15

unnecessarily, and, to the extent evidence of alternative theories was admitted, jurors might be confused by extraneous evidence. The Double Jeopardy Clause does not require those undesirable results.

Consistent with these principles, courts recognize that there is no bar to retrial "where the evidence was insufficient merely because an intervening change in law moved the evidentiary goal posts." *United States v. Sepulveda*, 420 F. Supp. 3d 153, 168 (S.D.N.Y. 2019) (Sullivan, J., sitting by designation), *abrogated on other grounds by United States v. Miller*, 954 F.3d 551 (2d Cir. 2020). Thus, when an intervening decision changes the scope of the statute of conviction, other Courts of Appeals remand for a new trial without first assessing the sufficiency of the evidence under the new standard. *See, e.g.*, *United States v. Reynoso*, 38 F.4th 1083, 1091 (D.C. Cir. 2022); *United States v. Harrington*, 997 F.3d 812, 817 (8th Cir. 2021); *United States v. Houston*, 792 F.3d 663, 670 (6th Cir. 2015); *United States v. Ford*, 703 F.3d 708, 712 (4th Cir. 2013); *United States v. Robison*, 505 F.3d 1208, 1225 (11th Cir. 2007); *United States v. Ellyson*, 326 F.3d 522, 534 (4th Cir. 2003); *United States v. Wacker*, 72 F.3d 1453, 1465 (10th Cir. 1995);[4] *United States v. Kim*, 65 F.3d 123, 126-27 (9th Cir. 1995); *United States v. Weems*, 49 F.3d 528, 531 (9th Cir. 1995).

---

[4] As noted in *Bruno*, the Tenth Circuit has been somewhat inconsistent on this point. *See Bruno*, 661 F.3d at 743 n.2.

16

This Court should do the same here and remand for a new trial without evaluating the sufficiency of the evidence under the *Ciminelli* standard. It would be anomalous to "measure the evidence introduced by the government against a standard it did not know it had to satisfy and potentially prevent it from ever introducing evidence on that element." *Houston*, 792 F.3d at 670. Under "then-prevailing law," namely decades of Second Circuit right-to-control jurisprudence, the Government "had no requirement to prove at trial" a traditional property interest rather than rely on the right-to-control theory. *Reynoso*, 38 F.4th at 1091. Thus, the Government "had no reason to introduce such evidence" of a traditional property interest at the defendants' trial in this case. *Kim*, 65 F.3d at 126-27; *accord Reynoso*, 38 F.4th at 1091; *Robison*, 505 F.3d at 1225 (district court's application of prevailing law "deprived the government of any incentive to present evidence that might have cured any resulting insufficiency"). Simply put, any "insufficiency in the proof here was caused by the subsequent change in the law effected by [*Ciminelli*], not the government's failure to muster evidence under the legal standard that existed as binding precedent at the time of the trial." *Ford*, 703 F.3d at 712 (citing *Ellyson*, 326 F.3d at 534); *see also Harrington*, 997 F.3d at 817 ("The conviction is then set aside not because the government failed to prove its case but because the incorrect instructions allowed the jury to convict under the wrong legal standard."). In these circumstances, the Government "cannot be held responsible for failing to muster evidence sufficient to satisfy a standard which did not exist at the time of trial." *Wacker*, 72 F.3d at 1465.

Importantly, permitting retrial "merely recreates the situation that would have been obtained if the trial court" had the benefit of the Supreme Court's later ruling in *Ciminelli*. *Nelson*, 488 U.S. at 42. Retrial "does not give the Government a second opportunity to prove what it should have proved earlier," but rather "a first opportunity to prove what it did not need to prove before but needs to prove now." *Harrington*, 997 F.3d at 818. At a retrial, the Government "would not be seeking a second bite at the apple but a *first* bite under the right legal test" as articulated by the Supreme Court in *Ciminelli*. *Houston*, 792 F.3d at 670.

Accordingly, this case should be remanded for retrial on the wire fraud counts regardless of whether the evidence at the defendants' prior trial would be sufficient now under *Ciminelli*.

### 2. The Defendants' Categorical Arguments Against a Retrial Are Unpersuasive

The defendants argue that they may not be retried under a traditional property theory mandated by *Ciminelli* because the Government relied at trial solely on the now-invalid right-to-control theory. (Remand Br. 9-17). In making this argument, the defendants studiously avoid discussing (or even citing) *Bruno* or any of the numerous out-of-Circuit decisions that address whether retrial is permitted after a conviction is vacated based on a change in the scope of the statute of conviction.

*Bruno* forecloses the defendants' categorical argument against a retrial. Bruno argued that "the case against him—from its inception up to his conviction—

18

was built around a theory of honest services fraud," *i.e.*, an undisclosed conflict of interest, which was later "invalidated by *Skilling*," and contended that he accordingly was entitled to a judgment of acquittal. *Bruno*, 661 F.3d at 742. The Court permitted a retrial after assessing the sufficiency of the evidence under the new *Skilling* standard, while acknowledging that in other cases retrial may be permitted without the need to conduct a sufficiency inquiry. *Id.* at 743-45. Thus, when the Government relies on a theory (an undisclosed conflict of interest in *Bruno*; the right-to-control theory here) subsequently invalidated by the Supreme Court, the Government is permitted to retry the defendants under a valid theory (the bribe-or-kickback theory in *Bruno*; a traditional property theory here) in at least some circumstances. As discussed above, this Court should resolve the question reserved in *Bruno*, and follow the practice of numerous other Courts of Appeals, by remanding for a new trial without considering the sufficiency of the evidence under the new standard. But in all events, this Court has already rejected the defendants' position that retrial on a valid theory is categorically barred when a defendant was initially tried and convicted under a subsequently invalidated theory.

Rather than contend with controlling authority, the defendants rely on cases concerning the scope of review where the appellate court considers whether to affirm a conviction following review of the sufficiency of the evidence. Those cases are inapposite, however, because the Government is not asking this Court to *affirm* the defendants' wire fraud conviction, but rather to vacate them and permit *retrial*.

19

First, the defendants rely on two cases—*United States v. Frampton*, 382 F.3d 213 (2d Cir. 2004), and *United States v. Gonzales*, 841 F.3d 339, 349-50 (5th Cir. 2016)—both of which involved sufficiency review of convictions as to which the jury was provided with a special verdict form and selected one of two possible bases for conviction. (*See* Remand Br. 10-11). In other words, in each of these cases, the jury convicted on one basis for liability and acquitted on another. *See Gonzales*, 841 F.3d at 344-45; *Frampton*, 382 F.3d at 224. In those circumstances, this Court, as well as the Court of Appeals for the Fifth Circuit, concluded that there was insufficient evidence to support the conviction returned by the jury and that the court could not uphold the conviction on the alternative basis on which the jury had acquitted. *Frampton*, 382 F.3d at 224; *see also Gonzales*, 841 F.3d at 349-51. These cases have no application here. There was no special verdict form in this case, and the jury did not acquit the defendants of any theory under the wire fraud counts of conviction—let alone of any traditional property theory. More fundamentally, though, the question presented at this stage is not whether to affirm the defendants' convictions at all; instead, the issue is only whether the defendants may be retried where the applicable law has changed after a conviction that was supported by ample evidence under the law at the time the jury returned its verdict. On that question, *Frampton* and *Gonzales* are silent.

Second, the defendants rely on a number of cases more generally standing for the proposition, in the defendants' view, that when reviewing the sufficiency of the evidence on direct appeal, an appellate court

20

should not consider alternative "theories" to what was presented by the government at trial. (*See* Remand Br. 11-17). For example, the defendants cite *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (*see* Remand Br. 12), where the government proceeded solely on an aiding-and-abetting theory of drug possession, presented insufficient evidence of that theory to support the jury's verdict, and then sought affirmance based on a *Pinkerton* theory. But the defendants' reliance on cases like this is fundamentally flawed for the same reason as their reliance on *Frampton* and *Gonzales*: the question for this Court is not whether to affirm the defendants' convictions on an alternative theory, but whether retrial is permitted.

### POINT II

### The Evidence Is Sufficient to Establish Wire Fraud After *Ciminelli*

Even if this Court were to assess the sufficiency of the evidence under *Ciminelli*, the same result—remand for retrial rather than a judgment of acquittal for the defendants—would be warranted. The evidence at the defendants' prior trial is sufficient under a traditional money-or-property theory of fraud, and the defendants' claims to the contrary are without merit.

### A.   Applicable Law

In assessing the sufficiency of the evidence against new law, this Court "still appl[ies] well settled principles," and must "credit every available inference in the government's favor and conclude that a retrial is not barred by the Double Jeopardy Clause if any rational

21

trier of fact could have found" the defendant guilty under the requirements the law now imposes. *Bruno*, 661 F.3d at 743.

"The federal mail and wire fraud statutes penalize using the mails or a wire communication to execute 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting 18 U.S.C. §§ 1341, 1343). The essential elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). "In order to prove the existence of a scheme to defraud, the government must also prove that the misrepresentations were material and that the defendant acted with fraudulent intent." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017); *see also United States v. Caltabiano*, 871 F.3d 210, 218 (2d Cir. 2017) ("[T]o prove a scheme to defraud under the federal mail fraud statute, the Government had to establish that [the defendant] (1) had an intent to defraud, (2) engaged in a scheme to defraud involving material misrepresentations—that is, misrepresentations that would naturally tend to influence, or are capable of influencing, the decision of the decisionmaking body to which they were addressed, and (3) used the mails to further that scheme.").

## B.  Discussion

The defendants argue that the evidence adduced at trial was insufficient on a single point: "the

22

government failed to prove an essential element—that Defendants sought to 'rip off' Fort Schuyler." (Remand Br. 18). But there is no requirement under the wire fraud statute of this sort of intent to harm, and therefore the defendants' claim that the evidence was insufficient must be rejected. And even if there were such an element, as articulated by the defendants, the proof at trial was still sufficient, as there was certainly sufficient evidence that the defendants contemplated economic harm or injury to the victim, as the jury, the District Court, and this Court all have already found.

### 1. The Evidence Is Sufficient to Establish Traditional Property Fraud

The wire-fraud statute requires the Government to show that a defendant, intending to defraud his victim, made material misrepresentations with the object of obtaining money or property, and used the wires to further the scheme. The Supreme Court has now held that "potentially valuable economic information necessary to make discretionary economic decisions is not a traditional property interest," and thus "the right-to-control theory is not a valid basis for liability under § 1343." *Ciminelli*, 598 U.S. at 309. Even after this narrowing of the statute, however, the evidence presented at the defendants' trial remains sufficient to establish wire fraud. Because *Ciminelli* concerns the property element and the defendants challenge the sufficiency of the evidence of only the intent element, the discussion below is limited to those two elements.

23

### a. The Defendants Schemed to Obtain Money or Property

The wire-fraud statute requires the Government to show that a fraudulent scheme was designed to obtain money or property. Although the statute refers to a scheme or artifice "to defraud, *or* for obtaining money or property," 18 U.S.C. § 1343 (emphasis added), the Supreme Court has construed the statute's "disjunctive language as a unitary whole," *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020); *see McNally v. United States*, 483 U.S. 350, 358-60 (1987). As a result, to sustain a conviction for property fraud, money or property "must be an 'object of the fraud.'" *Kelly*, 140 S. Ct. at 1573 (quoting *Pasquantino v. United States,* 544 U.S. 349, 355 (2005)).

In interpreting the phrase "money or property," the Supreme Court has relied on the "ordinary or natural meaning" of those terms. *Pasquantino,* 544 U.S. at 356. That ordinary meaning "extend[s] to every species of valuable right and interest." *Id.* (quoting *Black's Law Dictionary* 1382 (4th ed. 1951) ("*Black's*")). Thus, while the phrase does not include the right to an employee's "honest services," *Skilling,* 561 U.S. at 402; *see id.* at 399-402, or "purely regulatory" government decisionmaking, *Cleveland v. United States*, 531 U.S. 12, 22 (2000), it encompasses "'property rights'" both "tangible" and "'intangible,'" *Carpenter v. United States*, 484 U.S. 19, 25 (1987). Such rights include, for example, the right to "confidential business information," *id.*, and "[t]he right to be paid money," *Pasquantino,* 544 U.S. at 356.

24

The plain meaning of "obtain[ ]," 18 U.S.C. § 1343, in turn, includes the acquisition or retention of property that would otherwise be in someone else's hands. *See Pasquantino*, 544 U.S. at 355-56; *Carpenter*, 484 U.S. at 25-26; *see also Black's* 1228 (defining "obtain" as "[t]o get hold of by effort; to get possession of; to procure; to acquire, in any way"). The plain meaning of that term establishes that a defendant "obtains" property even if he provides some consideration—or even fair value—in exchange. A worker who has received a paycheck has indisputably "obtained" the funds therein, even though it is remuneration for his labor. The whole point of a contract is to exchange one thing for another, because each party views the trade as beneficial. But that does not make the two (or more) things that are exchanged equivalent in the sense of canceling each other out; instead, each party "obtains" what the other has agreed to provide. Thus, if a defendant induces a victim to enter into a transaction through material misrepresentations, his performance of his end of the bargain does not alter the fact that he "obtained" the victim's funds.

The defendants' scheme sought to "obtain[ ]" Fort Schuyler's "money or property," 18 U.S.C. § 1343. The fundamental "object of the fraud," *Kelly*, 140 S. Ct. at 1573 (quoting *Pasquantino*, 544 U.S. at 355), was obtaining the contract funds for COR Development and LPCiminelli. (*See* A. 1012 (Fraud Tr. 37); A. 1172 (Fraud Tr. 1010-11); A. 1404-05 (Fraud Tr. 2146-47) (District Court defining the charged and proven conduct as "involvement in the schemes to defraud Fort Schuyler by rigging the preferred developer selection process in order to obtain subsequent lucrative

25

contracts"). And the direct result of the scheme's design was that Fort Schuyler literally paid "money," 18 U.S.C. § 1343, to the defendants' respective companies. The defendants thereby sought to obtain, and succeeded in obtaining, contracts that were ultimately worth hundreds of millions of dollars. (*See, e.g.*, A. 1038 (Fraud Tr. 179); A. 1039 (Fraud Tr. 180-83); A. 1172 (Fraud Tr. 1011)).

The valuable contracts, and the payments on those contracts, that the defendants succeeded in obtaining readily qualify as "money or property." 18 U.S.C. § 1343. They were "'property' in the victim's hands," *Pasquantino*, 544 U.S. at 355 (quoting *Cleveland*, 531 U.S. at 26), as well as in the defendants' hands, *see, e.g.*, *id.* at 356 ("The right to be paid money has long been thought to be a species of property." (citing Founding-era treatises)). And as discussed above, whether paid out under a contract or otherwise, the "obtaining" of "money," 18 U.S.C. § 1343, unambiguously satisfies the relevant statutory requirement. Here, "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Skilling*, 561 U.S. at 400.

### b. The Defendants Intended to Defraud by Intending to Induce Reliance on False Representations about the RFP Process

The fraud statutes incorporate the common-law requirement of intent to defraud—that is, intent to induce reliance. *Carpenter,* 484 U.S. at 28. "At common law, misrepresentation made for the purpose of

26

inducing reliance upon the false statement is fraudulent." *Chiarella v. United States*, 445 U.S. 222, 227-28 (1980); *see* Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit."); 2 C.G. Addison, *Wrongs and Their Remedies: A Treatise on the Law of Torts* § 1174, at 1004 (4th English ed. 1876) ("*Addison on Torts*") ("[I]f a falsehood be knowingly told, with an intention that another person should believe it to be true, and act upon it, . . . the party telling the falsehood is responsible in damages in an action for deceit."); 3 Dan B. Dobbs et al., *The Law of Torts* § 664 (2d ed. 2011) ("Dobbs") (similar). The mens rea for the crime of false pretenses, which is consistent with the federal fraud statutes, is accordingly satisfied when the defendant "intend[s] the victim to rely upon his misrepresentation." 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.7(f)(2) (3d ed. 2018) ("LaFave").

Financial harm to the victim is a common feature of fraudulent schemes. But the Supreme Court has rejected the contention that the federal fraud statutes include any requirement of actual or contemplated financial harm.

As the Supreme Court has long recognized, proof of actual harm is not required because the federal fraud statutes "prohibit[ ] the 'scheme to defraud,' rather than the completed fraud." *Neder v. United States*, 527 U.S. 1, 25 (1999). And because even a failed scheme violates the statute, the government need not prove that the victim *actually* relied on the defendant's

27

misrepresentations, much less that the victim suffered harm. *Id.* at 24-25. Nor is such a requirement a necessary feature of "obtain[ing]" property. Providing a good or service in exchange for money does not alter the fact that the money was "obtained."

The Supreme Court has likewise rejected the suggestion that the fraud statutes require a showing of intended or contemplated financial harm. In *Shaw v. United States*, 580 U.S. 63 (2016), a defendant charged with bank fraud argued that he could not be convicted because "he did not intend to cause the bank financial harm." *Id.* at 67. The Supreme Court disagreed, emphasizing that the statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Id.* The Court instead endorsed Judge Learned Hand's observation that "'a man is nonetheless cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'" *Id.* (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (Hand, J.)); *see Loughrin v. United States,* 573 U.S. 351, 366 n.9 (2014) (rejecting the argument that the bank-fraud statute "requires the Government to prove that the defendant's scheme created a risk of financial loss to the bank"); *Carpenter*, 484 U.S. at 26 (rejecting any requirement of actual or intended "monetary loss").

The Court's decision in *Shaw* accords with the settled rule at common law. For example, "it is generally held that the lack of financial loss is no defense" to the common-law crime of "false pretenses." 3 LaFave § 19.7(i)(3). And even if a plaintiff in a common-law civil action for fraud could not obtain damages in the

28

absence of financial harm, she might be able to obtain rescission. *See* 3 Dobbs § 664 n.6 ("If the plaintiff bargained for a Titian but got a Giorgione of equal value, she would have no pecuniary damages, but should be permitted to get rescission.").

To the extent that a fraudster's intent to harm the victim was ever relevant at common law, it was relevant only to whether punitive damages were warranted, not to whether the defendant had "culpab[le]" intent. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 107, at 741 (5th ed. 1984); *see, e.g.*, 2 *Addison on Torts* § 1175, at 1005 ("In order to maintain an action for deceit, . . . it is not necessary to prove that the false representation was made from . . . a wicked motive of injury to the plaintiff."); 1 Melville M. Bigelow, *A Treatise on the Law of Fraud on Its Civil Side* 538 (1888) ("[I]t is not necessary, even in an action for damages, for the plaintiff to prove that the defendant intended to injure him."); Henry T. Terry, *Intent to Defraud*, 25 Yale L.J. 87, 99 (1915) (explaining that "the maker of the representation . . . need not intend to cause any actual harm or loss").

Of course, financial harm to the victim is a common—perhaps even typical—feature of fraud. But it is not required: An applicant who obtains a job (and the accompanying salary) by materially misrepresenting her qualifications commits fraud even if she intends to, and does, perform the required work. A student who obtains scholarship funds by materially misrepresenting his qualifications commits fraud even though the grantor pays no more than it would have if the scholarship had gone to someone else. And a contractor

commits fraud if it obtains a lucrative contract by materially misrepresenting its qualifications, whether or not the client can prove that she could have secured better or cheaper work had the fraud not occurred. *See, e.g.*, *United States v. Leahy*, 464 F.3d 773, 787-89 (7th Cir. 2006) (rejecting challenge to sufficiency of indictment where defendants falsely represented critical qualifications in order to obtain government contracts, despite defendants' argument that the victim received "a service worth every dime in the contracts"). In these examples, whether or not the victims got fair value in a pocketbook sense, they have been cheated out of a fundamental aspect of what they sought to acquire.

The evidence demonstrated that the defendants acted with fraudulent intent. As this Court recognized, that evidence included e-mails showing Aiello, Gerardi, and Ciminelli "communicating with Howe on how to rig the RFP process." *Percoco*, 13 F.4th at 173. For example, Kaloyeros explicitly sought Ciminelli's input on how to "fine tune" the specifications for a preferred developer "to fit" LPCiminelli. *Id.* The defendants' companies then made written representations that they had been selected in a competitive process—representations that were plainly intended to induce Fort Schuyler to enter into multi-million-dollar contracts. *See id.* at 172 & n.9.

Nothing about that scheme, and what it accomplished, was inadvertent or accidental. Instead, it was fraudulent inducement of the sort that the Supreme Court has recognized for well over a century as a valid basis for a federal property-fraud conviction. See, *e.g.*, *Durland v. United States*, 161 U.S. 306, 313 (1896)

30

(affirming mail-fraud conviction based on fraudulent inducement); *United States v. Sampson*, 371 U.S. 75, 77 (1962) (similar).

### 2. Traditional Money-Or-Property Fraud Does Not Require Proof of Intent to "Rip Off"

The defendants contend that, "if the defendant intends an exchange of fair value in a completed transaction, such that the victim receives what it paid for, that is not property fraud." (Remand Br. 19). In other words, according to the defendants, if a defendant obtains property from another by means of material misrepresentations, the defendant has not committed fraud unless the defendant also intends some permanent loss of overall value to the victim, which the defendants here refer to as financial or pecuniary harm. That view finds no support in the statute nor in the decisional law.

Although it is true that the caselaw has referred to a requirement "'that defendants *contemplated* some actual harm or injury to their victims'" (Remand Br. 19 (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)), harm or injury has a specific meaning in the context of property fraud. That is, "[u]nder the classic mail fraud theory, the harm involved in the scheme is the deprivation of money or tangible property." *United States v. Muratov*, 849 F. App'x 301, 306 (2d Cir. 2021); *see also United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2007) ("harm" satisfied by scheme to temporarily deprive another of use of property); *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.

31

1999) ("[T]he proof must demonstrate that the defend-
ant had a conscious knowing intent to defraud and
that the defendant contemplated or intended some
harm to the property rights of the victim."). Thus,
there is no requirement that a defendant contemplate
a financial loss to the victim, so long as the defendant
intends to obtain the victim's property.

In fact, in *Shaw*, the Supreme Court rejected the
position now advanced by the defendants. As noted
above, the defendant in *Shaw*, 580 U.S. 63, who used
bank account information he procured in order to
transfer funds belonging to another person but in the
custody of the bank, argued that while he obtained
funds in the possession of the bank, he did not defraud
the bank because "he did not intend to cause the bank
financial harm." *Id.* at 67. The Supreme Court rejected
that argument, holding that "the [bank fraud] statute,
while insisting upon 'a scheme to defraud,' demands
neither a showing of ultimate financial loss nor a
showing of intent to cause financial loss." *Id.* In reach-
ing that conclusion, the Supreme Court drew upon
long-settled law in the mail and wire fraud context, ob-
serving "that, when interpreting the analogous mail
fraud statute, we have held it 'sufficient' that the vic-
tim (here, the bank) be 'deprived of its right' to use of
the property, even if it ultimately did not suffer unre-
imbursed loss." *Id.* (quoting *Carpenter*, 484 U.S. at 26-
27); *see also Neder*, 527 U.S. at 20-25 (noting that the
bank fraud statute was modeled on the mail and wire
fraud statutes, and that all of these fraud statutes are
interpreted in light of the common law). And indeed,
also as noted above, the Supreme Court drew on this
Court's decision in *Rowe*, where Judge Learned Hand

32

observed that "'a man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value,'" *Shaw*, 580 U.S. at 67 (quoting *Rowe*, 56 F.2d at 749).

The defendants' argument is similarly inconsistent with longstanding precedent making clear that it is no defense to fraud that the defendant intends to repay the victim or otherwise does not intend any permanent loss of money or property. *See United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from the defendant's fraudulent conduct."); *cf. Males*, 459 F.3d at 158-59 ("The requirement under § 1343 that the defendant devise a scheme or artifice for obtaining money or property is satisfied where a defendant fraudulently obtains the *use* of another person's money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so.").

Nor are these principles inconsistent with this Court's decisions in *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1974), or *Starr*, 816 F.2d 94, on which the defendants here rely as "seminal decisions" (Remand Br. 19). In *Regent*, this Court was confronted with a highly stylized set of facts. 421 F.2d at 1176-77. In substance, the defendants in *Regent* sought review of a business practice employed by sales agents for stationery supplies to get past secretaries

and speak to purchasing agents by falsely claiming that the sales agent had been referred to the customer by a friend or officer of the purchasing company, or that the sales agent was looking to dispose of stationery because the agent was a doctor or other professional or because the sales agent was looking to get rid of the stationery that had belonged to a deceased friend. *Id.* Upon speaking to the purchasing agent, however, the sales agent made no misrepresentations about the stationery or otherwise about the deal to be entered. *Id.* at 1177, 1180. Upon these facts, this Court concluded that there was no scheme to defraud because there was no "false representation[ ] . . . directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain," and therefore no contemplation of harm within the meaning of the mail fraud statute. *Id.* at 1179-82. In *Starr*, this Court similarly concluded that there was insufficient evidence of a scheme to defraud customers where the defendants in effect failed to tell customers that the defendants were cheating the post office to make additional profit off of the postage services provided by the defendants to their customers. 816 F.2d at 98-101.

From these cases, the defendants discern the rule that "if the defendant intends an exchange of fair value in a contemplated transaction, such that the victim receives what it paid for that is not property fraud." (Remand Br. 19). But this language is found nowhere in *Regent* or *Starr* and is not a rule pronounced by those cases or any other. Although the defendants wish to focus on language in *Regent* regarding misrepresentations that are "not directed to the quality, adequacy or price of goods to be sold," what *Regent* actually

34

provides is that is there is no fraud where there is "so-licitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, *or otherwise to the nature of the bargain*." 421 F.2d at 1179 (emphasis added).

In other words, where the misrepresentation is not collateral but is rather material to the bargain or decision in question, there does exist a scheme to defraud—that is, a scheme to injure the victim by deprivation of the victim's property. *Starr*, 816 F.2d at 98 (explaining that the representations at issue in *Regent* were "only collateral to the sale"); *see also Weaver*, 860 F.3d at 94-95 (noting "the connection between the materiality element and the additional requirement that the government prove fraudulent intent" and explaining that materiality is what distinguishes a false statement that affects evaluation of a proposal). Indeed, in *Regent*, this Court, though focused on the pecuniary impact of the representations, distinguished the facts in that case from those in *Rowe* by explaining that in *Rowe* "[t]he defendants' representations regarding the value of the lots were unquestionably false representations of fact material to the bargain." *Regent*, 421 F.2d at 1182. And in fact, this Court has rejected the very interpretation of *Regent* and *Starr* that the defendants now advance, concluding instead that all that is necessary for misrepresentations to constitute a scheme to defraud is that they be material to the bargain in question. In *United States v. Schwartz*, this Court observed that while a defendant must "contemplate[ ] doing actual harm," that harm "need not be pecuniary in nature." 924 F.2d 410, 420 (2d Cir. 1991). This Court explained that "[i]n both *Starr* and *Regent,*

upon which appellants rely [to argue that pecuniary harm is necessary], the defendants' false representations were collateral to the bargain and did not cause any discrepancy between benefits reasonably anticipated and actual benefits received." *Id.* Where the misrepresentations went to an "essential element" of the bargain, however—in that case, how the goods would be used by the purchaser—there was a scheme to defraud, and "[t]he fact that [the victim] never suffered —and that defendants never intended it—any pecuniary harm does not make the fraud statutes inapplicable." *Id.* at 420-21.

It is true, of course, that this Court has for decades primarily addressed this issue—that it is cognizable fraud under the wire and mail fraud statutes where the defendant induces the victim to part with property based on a material misrepresentation, regardless of any intent to cause permanent pecuniary harm— through the money or property element under the right-to-control theory of wire fraud. Consistent with that theory, and as happened in this case, juries have been instructed that "[p]roperty includes intangible interests such as the right to control the use of one's assets" and that "[t]his interest is injured when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets." *United States v. Finazzo*, 850 F.3d 94, 108 (2d Cir. 2017). Whatever the merit of that approach may be, the Supreme Court has now instructed that there is no property right, at least under the wire fraud statute, "to valuable economic information needed to make discretionary economic decisions," and

36

that therefore such a theory cannot be the basis for a fraud conviction. *Ciminelli*, 598 U.S. at 316.

But this Court has elsewhere explained that this same concept may correctly be rooted in the materiality requirement to the scheme-to-defraud element. *United States v. Jabar*, 19 F.4th 66, 82 n.60 (2d Cir. 2021) ("[L]iability under either [a right-to-control or traditional] theory turns on the materiality of the misrepresentations and requires us to consider whether the alleged deception "affect[ed] the very nature of the bargain." (quoting *United States v. Johnson*, 945 F.3d 606, 612 (2d Cir. 2019))). In short, where the misrepresentation is material to the actual decision or transaction and intended to deprive a victim of money or property, the requirement of contemplated harm under the wire fraud statute is satisfied, and there is no additional requirement of intent to cause pecuniary injury. *E.g.*, *Schwartz*, 924 F.2d at 420-21.

Of course, there is no doubt that a reasonable jury could find that the misrepresentations here were material to the decision by Fort Schuyler to part with its money or property, particularly given that the jury in this case did reach that conclusion. In fact, not only was the jury instructed that it must find that the false or fraudulent representation relate to a material matter, defined as a "fact . . . that was capable of influencing the decision-maker to whom it was directed—here, Fort Schuyler," but as a result of the right-to-control instructions in this case, the jury was also required to find that the defendant's misrepresentations "affect[ed] the victim's assessment of the benefits or burdens of a transaction, or relate[d] to the quality of

37

goods or services received or the economic risks of the transaction," and "exposed [the victim] to tangible economic harm" in that they "created an economic discrepancy between what Fort Schuyler reasonably anticipated it would receive and what it actually received." (A. 1554-55). As the Government previously set out (Gov't Br. 121-40), the proof of these facts at trial was extensive and certainly sufficient for a reasonable juror to conclude that the misrepresentations were material rather than collateral to the bargain, *Schwartz*, 924 F.2d at 420.

### 3. The Evidence Is Sufficient to Support a Finding of Intent to Cause Pecuniary Harm

Even if proof of intent to cause pecuniary harm or financial loss were required, the evidence at the prior trial was more than sufficient to establish that "some actual [pecuniary] injury to the victim, however slight, [wa]s a reasonably probable result of the deceitful representations." *Regent*, 421 F.2d at 1182.

As this Court recognized, the trial evidence proved, in sum, that the defendants engaged in a successful scheme to obtain Fort Schuyler's money and property by denying Fort Schuyler the opportunity to secure, through a competitive request-for-proposals process, better or economically more favorable services from another vendor. *See Percoco*, 13 F.4th at 170-71; *see also Ciminelli*, 598 U.S. at 310 (the "RFPs effectively guaranteed that LPCiminelli would be (and was) selected as a preferred developer for the Buffalo projects" and "[w]ith that status in hand, LPCiminelli secured the marquee $750 million 'Riverbend project' in

Buffalo"). Fort Schuyler employed an RFP process "because of its desire for free and open competition," and its board "relied on this aspect of the process to achieve its economic objective," which was "selecting the lowest-priced or best-qualified vendor." *Percoco*, 13 F.4th at 171. The defendants schemed, however, to "circumvent[ ] Fort Schuyler's typical bidding process." *Id.* at 166. They did so by creating a process to identify preferred developers for Buffalo and Syracuse and then drafting RFPs to ensure that the defendants' companies would be selected. *Id.* at 166-68. This bid-rigging succeeded, in that it ultimately resulted in COR Development obtaining more than $100 million in construction projects and LPCiminelli obtaining a $750 million construction project. *Id.* at 168. And, further, the Court recognized that this bid-rigging deprived Fort Schuyler of the ability to "select[ ] a preferred developer who could offer more favorable economic terms for development contracts that Fort Schuyler eventually negotiated." *Id.* at 172 n.8 (discussing trial testimony establishing that multiple of the defendants' rivals charged "construction management fees [that were] typically lower than those of both LPCiminelli and COR," and that one of those rivals decided not to apply for the Buffalo RFP as a result of the defendants' fraud). And trial evidence established that preventing Fort Schuyler from obtaining a better price or better services was not just the potential result of the defendants' scheme—it was their aim. Kaloyeros specifically designed RFPs to avoid competition over the price of particular projects, to avoid LPCiminelli or COR Development losing out to a company that underbid them. (A. 619, 1050 (Fraud Tr. 242-43), 1183-84

39

(Fraud Tr. 1054-58), 1575, 1619, 1645-46; SA 877-81).
In short, the fraud was designed such that injury to
Fort Schuyler was "a reasonably probable result." *Regent*, 421 F.2d at 1182.

But economic injury was contemplated in another
way, even if not easily measured in dollars and cents.
As this Court observed, "the evidence, viewed in the
light most favorable to the government, demonstrated
that a competitive process was 'essential' both to the
selection of preferred developers and—in light of the
preferred developers' 'leg up' for projects that then
arose—to the award of the subsequent development
contracts." *Percoco*, 13 F.4th at 171. In other words,
Fort Schuyler did not receive at all what it bargained
for, which was, in light of the fact that Fort Schuyler
was paying in state-funded dollars, a partnership with
the services of a developer who had been selected
through a fair, open, and competitive process. (Gov't
Br. 135-38, 140). The misrepresentations were there-
fore "directed . . . to the nature of the bargain," and sat-
isfy *Regent*'s requirements even as characterized by
the defendants. *Regent*, 421 F.2d at 1179; *see also id.*
at 1182 ("In closer cases, where the representations do
not mislead as to the quality, adequacy of inherent
worth of the goods themselves, fraud in the bargaining
may be inferable from facts indicating a discrepancy
between benefits reasonably anticipated because of
the misleading representations and the actual benefits
which the defendant delivered, or intended to de-
liver.").

In response, the defendants seek to relitigate facts
that have already been resolved against them, seeking

40

to minimize the impact of certain of the Government's trial evidence and claiming that contractual provisions in Fort Schuyler's contracts somehow absolve them as a matter of law. (Remand Br. 27-29). But this Court has rejected this sort of disclaimer or integration clause defense, *Weaver*, 860 F.3d at 95, and in any case a reasonable jury would certainly be entitled to conclude, based on the testimony and evidence before it, that a competitive RFP process was material and indeed essential to Fort Schuyler's bargain, and that the defendants intended to deprive Fort Schuyler of that benefit (*see* Gov't Br. 35). In fact, that is precisely what the jury did find.

Finally, the defendants assert that the Government is wrong that they "intended to deprive Fort Schuyler of a better deal," because the evidence of potential harm is "theoretical and speculative," and that the Government must prove that the intended pecuniary harm would and did in fact occur. (Remand Br. 29-32). But here the defendants' argument is with the very authorities on which they seek to rely, as it was this Court in *Regent* that explained that all that is required is that some harm be "contemplated" by the defendant—that is, that some "injury to the victim, however slight, is a reasonably probable result of the deceitful representations." 421 F.2d at 1181-82; *see also, e.g.*, *United States v. Greenberg*, 835 F.3d 295, 305-06 (2d Cir. 2016) ("[T]he wire fraud statute requires the Government to show proof of a scheme or artifice to defraud, 18 U.S.C. § 1343, which itself demands a showing that the defendant possessed a fraudulent intent, but the Government need not prove that the victims of the fraud were *actually* injured, but only that

41

defendants *contemplated* some actual harm or injury to their victims."); *Schwartz*, 924 F.2d at 420 ("It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm."). And the defendants' various suggestions that a "theoretical possibility of harm" is insufficient (Remand Br. 31-32) miss the point: there is nothing speculative, hypothetical, or uncertain where a defendant intentionally engages in a scheme to defraud, knowing that his statements are false and fraudulent and intended to deprive a victim of his or her property, contemplating some potential loss or harm to the victim.

## POINT III

### Gerardi's False Statements Conviction Should Be Affirmed

Gerardi separately challenges his conviction on Count Sixteen, for false statements in violation of 18 U.S.C. § 1001, on two grounds. First, he argues that the Supreme Court's decision invalidating the right-to-control theory renders his false statements immaterial. Second, in light of the vacatur of his wire fraud convictions, he argues that his false statements conviction should be vacated on the ground of prejudicial spillover. Because neither claim has merit, the Court should affirm Gerardi's conviction on Count Sixteen.

### A.   Relevant Facts

As discussed in greater length in the Government's prior brief (Gov't Br. 51-53, 186-98), the trial evidence established that Gerardi participated in a voluntary

42

proffer session with federal officers, while represented by counsel, at which he repeatedly lied. (SA 900-02 (Fraud Tr. 1684-86)). Gerardi made a number of false statements, in significant part about edits to the Syracuse RFP. He falsely claimed, for instance, that he did not ask for the Syracuse RFP to be tailored to advantage COR Development, and that edits Gerardi did propose to the RFP were not for that purpose, but were instead intended to assist *other* companies with which COR Development competed. (A. 1328 (Fraud Tr. 1694-95); A. 1330 (Fraud Tr. 1700); A. 1656, 1658, 1665; SA 903-04 (Fraud Tr. 1691-92)). The jury convicted Gerardi, finding beyond a reasonable doubt that he made materially false statements to the Government during the investigation that led to this case.

## B. Applicable Law

As noted above, this Court reviews preserved challenges to the sufficiency of the evidence *de novo*, but will "sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021). The reviewing court "must analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020).

43

Section 1001(a)(2) provides that a person who "knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation" in a matter within the jurisdiction of the executive branch of the federal Government is guilty of a crime. A statement is material in this context "if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed, or if it is capable of distracting government investigators' attention away from a critical matter." *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012).

"Materiality is broadly construed, and does not require proof of actual reliance." *United States v. Brettschneider*, 832 F. App'x 14, 16 (2d Cir. 2020). In other words, it does not matter if the statement is actually believed, or if it has a demonstrable impact on the investigation. *See Brogan v. United States*, 522 U.S. 398, 402 (1998) ("[M]aking the existence of this crime turn upon the credulousness of the federal investigator (or the persuasiveness of the liar) would be exceedingly strange; such a defense to the analogous crime of perjury is certainly unheard of."). It is thus no defense that a federal investigator to whom a defendant lies "already knew the answers to his questions," nor that truthful answers "would not have changed [the] investigation." *Jabar*, 19 F.4th at 84; *see also United States v. Mercedes*, 401 F. App'x 619, 620-21 (2d Cir. 2010) (false statement was material even though the interviewing agent "had ruled out the possibility of relying on the statement prior to its solicitation").

44

### C. Discussion

#### 1. The Invalidation of the Right-to-Control Theory Does Not Bear on the Materiality of Gerardi's False Statements

Three months before the criminal complaint in this case was filed, at a time when, as the defense tells it, the Government's investigation "was nearly over," Gerardi "voluntarily agreed to be interviewed by the U.S. Attorney's Office." (Remand Br. 33). During that interview, Gerardi stated that he had not tried to benefit COR Development by tailoring the Syracuse RFP, but was instead acting magnanimously, to help other developers; that he was seeking to foster, not stymie, competition for Fort Schuyler's business. (*See supra* at 41-42). Particularly given that context and the content of Gerardi's false statements,[5] his purpose can be

---

[5] The defense claims in passing that Gerardi was telling the truth. (Remand Br. 32-33 ("For starters, Gerardi's suggested edits to the draft RFP would have *broadened* the RFP so other developers would also qualify, just as Gerardi told prosecutors.")). But Gerardi does not pursue a claim of insufficient evidence as to falsity, and for good reason: he made this same factual argument to the jury (*e.g.*, A. 1514 (Fraud Tr. 2724)), which rejected it and convicted him. *See, e.g.*, *United States v. Clarke*, 979 F.3d 82, 91 (2d Cir. 2020) (rejecting sufficiency claim based on arguments made to, and rejected by, the jury); *United States v. Weaver*, 698 F. App'x 629, 632 (2d Cir. 2017) (rejecting sufficiency challenge based on the existence of

45

readily inferred: he sought to influence the Government's investigation to avoid being charged with a crime, and therefore the statements were material. *See Brogan*, 522 U.S. at 402 ("We cannot imagine how it could be true that falsely denying guilt in a Government investigation does not pervert a governmental function. Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very *purpose* of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function."); *Jabar*, 19 F.4th at 84 (false exculpatory explanation of conduct was material even though the investigating agent "already knew the answers to his questions" and testified that the statements "would not have changed his investigation").

Gerardi now asserts that his false and misleading statements could not have influenced the Government. The crux of Gerardi's argument is that his false statements were immaterial "[a]s a matter of law," because the conduct the Government was investigating "was not chargeable fraud because *Ciminelli* invalidated the right-to-control theory, and the government couldn't prove traditional property fraud." (Remand Br. 36). But the premise underlying Gerardi's argument is incorrect: as set forth above, the evidence presented at the prior trial is sufficient to establish traditional property fraud, and the case should be remanded for retrial of the wire fraud counts.

─────────

evidence negating fraudulent intent, because "the jury heard and rejected that evidence").

46

But even if Gerardi's premise about chargeability were correct, it would still be irrelevant.[6] Materiality does not turn on whether the Government's investigation will ultimately result in charges or convictions. That is why, for example, false statements made to *induce* a Government investigation—which, when discovered, by definition lead only to Section 1001 charges—are actionable. *See, e.g.*, *United States v. Shanks*, 608 F.2d 73, 74 (2d Cir. 1979) (per curiam) (affirming standalone false statements convictions arising from defendant's attempt to prompt an investigation into others); *United States v. Adler*, 380 F.2d 917, 922 (2d Cir. 1967) affirming Section 1001 convictions for defendant's "false statements to the F.B.I. calculated to provoke an investigation"). Indeed, a false statement made in a criminal investigation does not even need to directly relate to the crime under investigation: this Court has affirmed the materiality of a

––––––––––

[6] Tellingly, Gerardi cites no authority supporting the proposition that the Government's failure to charge or prove the crimes on which an investigation is predicated has any effect on the materiality of a false statement. He cites only a concurrence from a Ninth Circuit case (without identifying it as a concurrence). But that case has nothing to do with Gerardi's argument. Instead, in a brief *per curiam* opinion, the Ninth Circuit reversed on materiality grounds an obstruction of justice conviction that was based on a single "rambling, non-responsive answer to a simple question." *United States v. Bonds*, 784 F.3d 582, 582 (9th Cir. 2015) (en banc).

47

defendant's lying about his identity during a safety-valve proffer. That lie, although not directly relevant to the drug crime under investigation, "can impede the government's ability to develop information," or "to inform itself about the defendant and any relevant criminal history," and is therefore material. *Adekanbi*, 675 F.3d at 183. And, of course, false statements can be actionable even if they are not made in criminal investigations at all—let alone in successful investigations. *See, e.g.*, *Mercedes*, 401 F. App'x at 620-21.

As a fallback, Gerardi asserts that the Government did not "attempt to prove" that his "statements could or did impact the government's investigation in any way." (Remand Br. 37). The Supreme Court's decision in *Ciminelli* provides no basis to revisit the sufficiency of this evidence—an argument that was not raised previously, *see, e.g., Ventura de Paulino v. N.Y. City Dep't of Educ.*, 959 F.3d 519, 528 n.26 (2d Cir. 2020) (failure to raise objection to district court order in opening brief waives claim)—and, in any case, the argument that the false statements must have actually or potentially impacted this investigation as a matter of fact is defeated by the applicable standard for materiality, which focuses on whether a statement was "capable" of, or had a "tendency to" influence an investigation, rather than on whether the statement actually could have or did affect the specific Government investigation at issue. *E.g.*, *Jabar*, 19 F.4th at 84; *cf. also United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013) (per curiam) ("[A] misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do.").

48

Gerardi's new challenge to the Government's proof of materiality should be rejected, and his conviction on Count Sixteen should be affirmed.

### 2. Gerardi Is Not Entitled to a New Trial on "Prejudicial Spillover" Grounds

Gerardi also argues—as he did previously on appeal to this Court—that his false statements conviction should be vacated on the ground of prejudicial spillover. The Court should reject that argument for the reasons set forth in the Government's initial brief. (Gov't Br. 187-93).

49

## CONCLUSION

**Gerardi's conviction on Count Sixteen should be affirmed, the wire fraud counts should be vacated, and the case should be remanded for retrial.**

Dated:      New York, New York
            November 7, 2023

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

MATTHEW D. PODOLSKY,
DEREK WIKSTROM,
WON S. SHIN,
      *Assistant United States Attorneys,*
                  *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief is 49 pages in length and thus complies with the page limit set by this Court in its order dated July 10, 2023.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: WON S. SHIN,
*Assistant United States Attorney*